United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SARAH KOWALSKI,

          Plaintiff,

  v.

FARELLA, BRAUN & MARTEL, LLP, et al.,

          Defendants.

_____/

No. C-06-3341 MMC

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD; DENYING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

18

19

20

21

22

23

24

     Before the Court are the motion for judgment on the administrative record, filed
September 21, 2007 by plaintiff Sarah Kowalski, and the motion for summary judgment,
filed September 21, 2007 by defendants Paul Revere Life Insurance Company, Farella,
Braun & Martel, LLP, and Farella, Braun & Martel Long-Term Disability Plan.  Having
considered the parties' submissions in support of and in opposition to the motions, the
Court finds the matter appropriate for resolution without oral argument, see Civil L.R. 7-
1(b), and hereby rules as follows.

25

**BACKGROUND**

26

27

28

     Plaintiff was employed as a litigation associate by Farella, Braun & Martel, LLP
("Farella") from January 22, 2001 through October 25, 2002.  (See Decl. of Charlene
Stamey in Support of Mot. for Partial Summary J. Re: Exhaustion of Admin. Remedies Ex.

2 (Administrative Record (hereafter "AR")) at 20.)  Plaintiff subsequently submitted a claim for long-term disability benefits under the Farella, Braun & Martel Long-Term Disability Plan ("the Plan"), in which she states she has been "unable to work because of [her] condition" since October 28, 2002.  (AR 18-19.)  Plaintiff specifies therein that her disability is due to "working at a work station that was not ergonomic," "performing repetitive motions at her desk and computer," and, after her secretary quit, "having to perform even more keyboard, mouse, stapling and other repetitive tasks than normal."  (AR 18.)  Paul Revere Life Insurance Company ("Paul Revere"), the claims administrator,[1] identified October 25, 2002, a Friday, as plaintiff's "Last Day Worked" and October 26, 2002 as her "Disability Date." (AR 4.)

Paul Revere began paying plaintiff disability  benefits, under a reservation of rights, as of January 24, 2003.  (AR 430.)  On August 12, 2004, Paul Revere notified plaintiff it would not provide benefits beyond the initial 24-month period provided for in the Plan.  (AR 997-98.)  On October 28, 2004, after paying benefits for approximately 21 months, Paul Revere advised plaintiff it was denying further benefits, on the grounds that "there [was] no continued support in [plaintiff's] file for any impairment based on a medical problem and there [did] not appear to be any medical evidence to support restrictions and limitations that would prevent [plaintiff] from returning to work as an associate attorney."  (AR 1092.)[2]

Thereafter, on February 24, 2005, plaintiff requested reconsideration of the decision

---

[1] Paul Revere admits it "was the Claims Administrator for purposes of plaintiff's claim."  (See Answer ¶ 6.)  Consistent with such representation, and despite the use of Unum Provident claim forms, (see, e.g., AR 18 (plaintiff's disability claim form); AR 489 (plaintiff's supplemental statement)), and plaintiff's submission of materials to Unum Provident representatives , (see, e.g., AR 1138 (plaintiff's supplemental medical reports directed to "Unum Provident"); AR 1404 (plaintiff's appeal of benefits decision directed to "Unum Provident" Appeal Consultant)), the Court refers herein to the claims administrator as Paul Revere.

[2] The termination of plaintiff's benefits was effective October 24, 2004.  (See Defs.' Mot. for Summary J. at 4:13 (stating plaintiff's benefits terminated as of October 24, 2004); Pl.'s Mot. for J. on the Admin. Record at 28:21-23 (seeking benefits for period beginning October 25, 2004).)

1   to terminate benefits and submitted additional medical information in support of her

2   request.  (AR 1138.)  On July 13, 2005, Paul Revere denied plaintiff's request, stating the

3   additional information was "not sufficient to reverse [its] previous decision," (AR 1366), and

4   that plaintiff "would be able to perform [her] own occupation within the restrictions and

5   limitations" identified therein, (AR 1368).

6          By letter dated February 15, 2006, plaintiff appealed the termination of benefits.  (AR

7   1404-1432.)  Paul Revere subsequently failed to issue a decision on plaintiff's appeal within

8   the 90-day period prescribed by regulation.  (See Order Denying Defs.' Mot. for Partial

9   Summary J. Re: Exhaustion of Admin. Remedies, filed May 7, 2007, at 6.)

10         On May 22, 2006, plaintiff filed the instant action, in which she asserts two claims:

11  (1) a claim for disability benefits pursuant to the Employee Retirement Income Security Act

12  of 1974 ("ERISA"), brought against all defendants, (see First Amended Complaint ("FAC") ¶

13  11), and (2) a claim for breach of fiduciary duty under ERISA, brought solely against Paul

14  Revere, (see id. ¶ 14).  Plaintiff seeks an award of benefits, from October 25, 2004 to the

15  present, and prejudgment interest thereon.

16         The Court previously determined that plaintiff had exhausted her administrative

17  remedies before bringing the instant action, (see Order Denying Defs.' Mot. for Partial

18  Summary J. Re: Exhaustion of Admin. Remedies, filed May 7, 2007, at 7), and that the

19  appropriate standard of review is de novo, (see Order Granting Pl.'s Mot. for Summary

20  Adjudication on the Standard of Review, filed July 23, 2007, at 4).

21                                **DISCUSSION**

22  **A.    Defendants' Summary Judgment Motion**

23         Defendants assert they are entitled to summary judgment on the ground that Paul

24  Revere properly terminated plaintiff's benefits.  Where, as here, the district court reviews de

25  novo the denial of benefits, a motion for summary judgment may be granted only where

26  there is no genuine issue of material fact as to whether the claimant is disabled under the

27  meaning of the subject policy.  See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1093-94

28  (9th Cir. 1999) (en banc).

Under the terms of the Plan, a participant may qualify as either "Totally Disabled" or

"Residually Disabled."  The Plan defines "Total Disability" as follows:

> TOTAL DISABILITY or TOTALLY DISABLED means that during the first
> 24 months after completing the Elimination Period, the Employee:
>
> 1.    is unable to perform the important duties of his own
>        occupation on a Full-time or part-time basis because of an
>        Injury or Sickness that started while insured under this
>        Policy; and
> 2.    does not work at all; and
> 3.    is under Doctor's Care.
>
> After 24 months of Own Occupation benefits have been paid, the
> Employee will continue to be Totally Disabled if he can not work in any
> occupation for which he is or may become suited by education, training or
> experience.

(AR 163.)  By comparison, a participant may qualify as "Residually Disabled" under the

Plan where a participant is "employed and is earning wages or a salary," and the following

criteria are met:

> For the Elimination Period and the first 24 months after the Elimination
> Period, RESIDUAL DISABILITY or RESIDUALLY DISABLED means, as a
> result of Injury or Sickness, the Employee is unable to perform all the
> important duties of his own occupation on a Full-time basis, but:
>
> 1.  he is able to perform one or more of the important duties of his own
>      occupation, or any other occupation, on a Full-time or part-time
>      basis; and
> 2.  he is earning less than 80% of his Prior Earnings.
>
> 24 months or more after the Elimination Period, RESIDUAL DISABILITY
> or RESIDUALLY DISABLED means, as a result of Injury or Sickness, the
> Employee is unable to work Full-time in any occupation for which he is or
> may become suited by education, training or experience, but:
>
> 1.  he is able to perform one or more of the important duties of any
>      occupation on a part-time basis; and
> 2.  he is earning less than 80% of his Prior Earnings.

(AR 163.)

As noted, Paul Revere terminated plaintiff's benefits on the ground that plaintiff was

able to perform her own occupation.  The administrative record contains evidence that, if

credited, would support a finding that plaintiff could not perform her own occupation.  (See,

e.g., AR 1493 (opinion of one of plaintiff's treating physicians that "[t]here is no way that

[plaintiff] is capable of returning to work").)  Conversely, the administrative record contains

4

1    evidence that, if credited, would support a finding that plaintiff could perform her own

2    occupation.  (See, e.g., AR 496 (statement of reviewing physician that he did "not find

3    support for [plaintiff's] inability to perform as an attorney").)  Indeed, defendants

4    acknowledge the existence of conflicting evidence on the issue of plaintiff's ability to

5    perform her own occupation.  (See, e.g., Defs.' Mot. for Summary J. at 21:8-10 (asserting

6    that "only Dr. Newkirk . . . supports [plaintiff's] contention" that her "diagnosis would

7    interfere with her ability to perform as an attorney," but "the more credible explanations are

8    presented by Dr. Minkowski, Dr. Soong, Dr. Lundy and Dr. Skomer").)  The Court may not

9    "evaluate the persuasiveness of conflicting testimony" at the summary judgment stage, see

10   Kearney, 175 F.3d at 1095, and, consequently, summary judgment is inappropriate in light

11   of this disputed factual issue, see, e.g., id. at 1093.

12        Accordingly, defendants are not entitled to summary judgment.  Rather, the Court

13   will "try the case on the record that the administrator had before it," and, pursuant to Rule

14   52, will state its findings of fact and conclusions of law with respect to plaintiff's claims.  See

15   id. at 1095.[3]

16   **B.    Plaintiff's Motion for Judgment**

17        As noted, plaintiff claims she is entitled to disability benefits from the date Paul

18   Revere terminated such benefits on October 24, 2004 to the present.  Plaintiff's claim

19   _____

20        [3] In so doing, the Court does not consider the extrinisic evidence submitted by
     plaintiff, to which defendant has objected, specifically, Exhibits 2 and 3 to the Declaration of
21   Geoffrey V. White ("Citigroup Global Market research report," and "ValuBond interest yield
     quotes," respectively), and the unmarked exhibit "Diagnosing Thoracic Outlet Syndrome,"
22   attached to plaintiff's motion for judgment on the administrative record.
          Ordinarily, "only the evidence that was before the plan administrator at the time of
23   determination should be considered" in a de novo review of a denial of benefits.  See Opeta
     v. Northwest Airlines Pension Plan for Contract Employees, 484 F.3d 1211, 1217 (9th Cir.
24   2007).  Evidence outside the administrative record is permitted "'only when circumstances
     clearly establish that additional evidence is necessary to conduct an adequate de novo
25   review of the benefit decision.'"  See Mongeluzo v. Baxter Travenol Long Term Disability
     Benefit Plan, 46 F.3d 938, 944 (9th Cir. 1995) (quoting Quesinberry v. Life Ins. Co. of North
26   America, 987 F.2d 1017, 1025 (4th Cir. 1993)).  Here, plaintiff has failed to show the
     existence of any unusual circumstances in which such evidence would be allowed.  See,
27   e.g., id. (permitting district court to take additional evidence where original review "was
     conducted under a misconception of the law").
28        Accordingly, defendants' objections to such evidence are sustained.

1   encompasses two types of benefits defined by the Plan: (1) "Total Disability" benefits for

2   the period from October 25, 2004 through January 23, 2005, based on plaintiff's inability to

3   perform her own occupation, (see Pl.'s Opp'n to Defs.' Mot. for Summary J. at 5:5-8), and

4   (2) "Residual Disability" benefits beginning January 24, 2005, based on plaintiff's ability "to

5   work part-time from home as an Executive Coach," (see id. at 7:10-12).  The Court first

6   examines plaintiff's claim for "Total Disability" benefits.

7          **1.  "Total Disability" Benefits**

8          In order to demonstrate she was "Totally Disabled" under the terms of the Plan for

9   the period of approximately three months from October 25, 2004 through January 23, 2005,

10  plaintiff must show that, during such period, she: (1) "[was] unable to perform the important

11  duties of [her] own occupation on a [f]ull-time or part-time basis because of an Injury or

12  Sickness that started while [she was] insured under [the Plan]" (AR 163); (2) "[did] not work

13  at all" (id.); and (3) "[was] under Doctor's Care" (id.).  Defendants do not dispute that

14  plaintiff did not work at all during the relevant three-month period, that plaintiff was under a

15  doctor's care during such time, or that the injury on which plaintiff bases her claim started

16  while plaintiff was insured under the Plan.  Thus the Court need evaluate only whether,

17  from October 25, 2004 through January 23, 2005, plaintiff was "unable to perform the

18  important duties of [her] own occupation on a [f]ull-time or part-time basis" because of

19  plaintiff's claimed injury.  (See id.)

20          **a.  Record Re: Total Disability Benefits**

21          As described by a Unum Provident Benefits Coordinator, the important duties of

22  plaintiff's occupation as an associate attorney at Farella Braun & Martel, LLP, and the

23  number of hours per week required for each such duty, are:  (1) "legal/other research, case

24  analysis" for 15-20 hours per week; (2) "document reviews and interview/witness

25  interviews" for 15-20 hours per week; (3) "drafting letters, briefs, memos, etc." for 20-30

26  hours per week; and (4) "court appearances, client mtg., depositions and documenting" for

27  5-10 hours per week.

28  (AR 20.)  As to the physical demands of plaintiff's occupation, again as described by said

6

Benefits Coordinator, plaintiff's occupation requires that she perform the following activities, for the specified number of hours per day: (1) "Occasionally," ("up to 3 hours"): walking, standing, bending (waist), squatting, kneeling, pushing & pulling (right hand), pushing & pulling (left hand), reaching (above shoulder level), and reaching (below shoulder level); (2) "Frequently," ("3-6 hours"): twisting (neck) and twisting (waist); (3) "Constantly," ("6-8+ hours"): sitting, bending (neck), repetitive use of hand, simple grasping (right hand), simple grasping (left hand), fine manipulation (right hand), fine manipulation (left hand), and reaching out from shoulder (left or right).  (AR 104.)  Plaintiff's occupation also requires "occasional" lifting and carrying of objects weighing up to 25 pounds, and "repetitive hand movement."  (AR 105.)

With respect to plaintiff's ability to perform such duties, plaintiff states that in October 2001, her "wrist, arm, and shoulder began hurting and continue[d] to get worse" due to "excessive use of computer, writing, [and] doing legal research."  (AR 74.)  During a March 20, 2003 telephone interview with a Paul Revere representative, plaintiff reported she had a "repetitive stress injury," and was "in constant pain and [was] limited in all activities of daily living."  (AR 317.)  Plaintiff also indicated at that time that she could "only work on a computer maybe 5 minutes before the pain is too extreme."  (Id.)  Plaintiff also reported that filling out forms was painful and that she was unable to complete a form in a doctor's office in one sitting.  (Id.)  When questioned by the representative about the location of the pain, plaintiff stated that "it moves," and specified that it occurs "in the front of her shoulders, the back of her shoulders, in her spine [and] neck, [and] radiates down her arms."  (Id.)  Plaintiff also stated that she experienced "numbness in her hands."  (Id.)  Plaintiff further stated she was not taking any medications, and that she "cannot take anti-inflammatory medications because they mess up her stomach."  (Id.)

The medical evidence submitted herein includes opinions offered by plaintiff's three treating physicians, specifically, Robert Minkowski, M.D., ("Dr. Minkowski"), Tracy Newkirk, M.D., ("Dr. Newkirk"), and James Avery, M.D., ("Dr. Avery"), as well as the opinion of

plaintiff's physical therapist Peter Edgelow.[4]  Additionally, plaintiff offers her own

declaration, which was submitted to Paul Revere as part of plaintiff's appeal of the decision

to terminate benefits.

On May 29, 2002, Dr. Minkowski, whose specialty is internal medicine (AR 577),

diagnosed plaintiff with "RSI" (repetitive strain injury), "CT strain and dysfunction," "rib

dysfunction," and "poor core muscle strength" (AR 410, 577-78).  At that time, Dr.

Minkowski recommended "deep tissue work, acupuncture, [and] pilates" for a duration of

six months, and was of the opinion that plaintiff was "able to perform [her] usual work."  (AR

410.)  Thereafter, on July 29, 2002, Dr. Minkowski restricted plaintiff to working no more

than eight hours per day, with "cumulative computer use" limited to two hours per day.  (AR

415.)  Dr. Minkowski continued such restrictions in a progress report dated September 23,

2002.  (AR 414.)

In a report dated September 30, 2002, prepared in connection with plaintiff's

Worker's Compensation claim, Dr. Minkowski stated that plaintiff "continu[ed] to do Pliates

exercise twice a week, acupuncture once a week and deep tissue massage once a week,"

(AR 404); he further noted, "plaintiff's job is quite stressful physically and mentally and to

make more significant functional progress she may need to be on temporary total disability"

(AR 405).  Approximately two weeks later, on October 16, 2002, Dr. Minkowski placed

plaintiff on "temporary disability," to begin October 25, 2002.  (AR 399.)  Thereafter, on

January 16, 2003, Dr. Minkowski reported plaintiff had pain and decreased mobility in her

neck and upper chest/shoulder region, (AR 22), opined that plaintiff was restricted from

"lifting, carrying, pushing, pulling, repetitive hand movement, gripping, or grasping," (id.),

and described plaintiff's limitations as: "use of a computer with keyboard or mouse, writing

limited to < 10 minutes, fine motor movements, [and] flexed head + neck position," (id.).

---

[4] To the extent plaintiff also relies on the Functional Capacities Evaluation conducted by Occupational Physical Therapist Kris Anderson on January 10-11, 2006, and the "Upper Extremity – Thoracic Outlet Syndrome Evaluation" conducted by Richard M. Braun, M.D. on February 8, 2006, such reports pertain to plaintiff's condition at a time substantially distant from the termination of the "Total Disability" period on January 23, 2005, and, as such, are not relevant to the instant discussion regarding "Total Disability."

Dr. Minkowski referred plaintiff to a neurologist, Dr. Newkirk, for a second opinion. (AR 579.)  In a report dated April 29, 2003, Dr. Newkirk noted plaintiff's symptoms included headaches once a week, bilateral neck pain, burning-type pain in her upper back, "tightness to her mid-back," burning-type pain in her anterior chest "with sharp stabbing shoulder pain which radiates down bilateral arms to hands," and bilateral hand numbness and tingling.  (AR 594.)  Dr. Newkirk found plaintiff's "neurological exam was within normal limits including mental status, cranial nerve, motor and sensory systems and reflexes."  (AR 594.)  Dr. Newkirk stated plaintiff's symptoms in her upper extremities, head, and neck were caused by "costo-clavicular compression," and diagnosed plaintiff with "organic writers cramp," "bilateral forearm dystonia," "thoracic outlet syn[drome],"[5] "cervical strain," and "sprain, thoracic."  (AR 595.)  Dr. Newkirk recommended treatment through physical therapy, continuing acupuncture, biofeedback, a postural brace, and trying various drug treatments including anti-inflammatories, membrane stabilizers, muscle relaxants, and transdermal medications.  (Id.)

On June 3, 2003, Dr. Newkirk again diagnosed plaintiff with thoracic outlet syndrome, "with probable axillary vein occlusion temporarily but recurrent."  (AR 616.) Upon evaluation on August 25, 2003, Dr. Newkirk stated plaintiff "is doing quite well."  (AR 1489.)  Dr. Newkirk reported plaintiff "had one isolated flare-up in early August for one day which resolved spontaneously," and her "[m]igranes have calmed down in addition to baseline pain."  (Id.)  Dr. Newkirk opined, however, that "[f]unctionally she is still very limited with . . . more than 15 minutes of computer use provoking symptoms."  (Id.)  In a subsequent report dated December 16, 2003, Dr. Newkirk stated plaintiff's functional ability was limited to sitting 30 minutes at a time for two total hours per day, walking for 30 minutes at a time for three total hours per day, standing for 30 minutes at a time for three total hours per day, and lifting five pounds occasionally.  (AR 1495.)

[5] According to neurologist Alan Neuren, M.D., "thoracic outlet syndrome is not a distinct entity, but refers to several types of conditions that can result in compromise of neural (nerve) or vascular structures as they course through the area referred to as the thoracic outlet between the base of the neck and axilla (armpit)."  (AR 1776.)

9

On February 5, 2004, Dr. Newkirk stated plaintiff was "not improving," was "having increasing problems with her neck," and "cannot type more than five minutes before pain occurs." (AR 1498.)  On April 16, 2004, Dr. Newkirk stated plaintiff's symptoms included "flare-ups lasting 72 hrs @ a time, migraines, and forearm pain." (AR 871.)  Dr. Newkirk described plaintiff's restrictions at that time as follows: "no lifting > 5 lbs, no keyboarding/mousing, limited neck flexor, no writing > 10-15 mins/day, no reaching @ or above shoulder level." (Id.)  That same date, Dr. Newkirk noted he expected plaintiff "to be released to work in [her] occupation" on June 10, 2004.  (Id.)  Subsequently, however, Dr. Newkirk found, on June 11, 2004, that plaintiff's disability was "permanent and stationary." (AR 1507.)  In a "Estimated Functional Abilities Form" dated June 16, 2004, Dr. Newkirk opined that plaintiff's "current functional ability" was "none." (AR 1509.)  On August 31, 2004, Dr. Newkirk reported plaintiff would remain "temporarily totally disabled" for 6-12 months.  (AR 1513.)

In a March 22, 2005 letter, Dr. Newkirk provided a more detailed diagnosis, specifically, that plaintiff had "bilateral thoracic outlet syndrome complicated by focal acquired limb dystonia" with evidence of "chronic cervical and thoracic strain," and symptoms that include "constant pain and numbness in the upper extremities, headache, inability to use the arms at all at or above shoulder level and the distinct inability to do any repetitive small hand and finger activities." (AR 1204.)  Dr. Newkirk stated therein the "physical evidence," and plaintiff's "clinical history," "make it manifestly obvious that [plaintiff] is unemployable in any capacity obviously for a very prolonged period of time, possibly permanently." (Id.).

Plaintiff was referred by Dr. Newkirk to Dr. Avery, a cardiovascular and thoracic surgeon.  (AR 599.)  On May 15, 2003, Dr. Avery diagnosed plaintiff with "thoracic outlet syndrome, bilaterally" and "a recent subclavian vein thrombosis, which has spontaneously resolved." (AR 600.)  After again examining plaintiff on January 12, 2005, Dr. Avery confirmed his diagnosis of "bilateral thoracic outlet syndrome," (AR 1147), noted plaintiff had ocular migraines "approximately once a month" and experienced increased pain when

10

1  she lifted her hands over her head, (AR 1150), but found plaintiff was "able to maintain her

2  functional level with physical therapy," (AR 1147).  Dr. Avery reported that plaintiff had

3  "significant limitations in terms of working at the computer" and could do so for a maximum

4  of 20 minutes at a time, and no more often than twice a week.  (AR 1150.)

5      The record also includes the opinion of plaintiff's physical therapist Peter Edgelow

6  ("Edgelow").  In a December 23, 2002 report, Edgelow stated his initial examination of

7  plaintiff had shown "C8 motor root irritability on the right, brachial plexus irritability

8  bilaterally, an elevated first rib bilaterally, and dysfunctional breathing pattern."  (AR 467.)

9  On April 24, 2003, Edgelow estimated plaintiff could only sit for a period of "30-120

10  minutes," write for "5 minutes or less w/o numbness/tingling," use a computer for "10

11  minutes w/o pain," and read for "10 minutes w/o neck/shoulder pain."  (AR 592.)

12      Plaintiff, in a declaration dated February 2006 and submitted to Paul Revere as part

13  of her appeal of the decision to terminate plaintiff's benefits, stated: "After a short period of

14  computer use (10-15 minutes), I experience burning and stabbing pain in my shoulders,

15  brachial plexus, forearms, and hands; and tremendous neck pain and headaches, which

16  often include brief visual disturbances, flu-like symptoms, weakness, and nausea."  (AR

17  1630.) Plaintiff further stated: "I can only flex my neck, as required for reading and writing,

18  for about 30 minutes per day."  If I flex my neck for more than 30 minutes a day, I get

19  "severe spasms in my neck, causing horrible headaches and ocular migranes."  (Id.

20  (emphasis in original).)  Plaintiff reported that, on some occasions, "it takes several days for

21  [her] to recover" from her headaches.  (Id.)  Additionally, plaintiff reported she "can only

22  write for 15 minutes at a time," after which she experiences "hand pain and cramping in

23  [her] hands."  (Id.)

24      In the same declaration, plaintiff stated that "[p]hysical therapy and acupuncture

25  provided some relief, but only for a day or so," and that she "found [she] got good pain

26  relief from [her] Qigong exercises, and from Salsa dancing."  (AR 1632.)  Plaintiff explained

27  that "dancing with a partner "allow[ed] her arms to be moved without exertion, which helped

28  mobilize and open up [her] rib cage, increase blood flow, and loosen [her] shoulders," and

that after she discussed her Salsa dancing with Edgelow and Dr. Newkirk, "they both encouraged [her] to continue it." (Id.)  With respect to Qigong, plaintiff explained that "Qigong is an art most like Tai Chi," which, initially, gave plaintiff "remarkable relief from [her] pain," and, if she "practice[s] Qigong and Feldenkrais [exercises] daily and avoid[s] aggravating activities, [she] ha[s] minimal and tolerable pain levels," (id.).  Plaintiff stated that dancing and Qigong have "helped reduce [her] pain symptoms," and "do[ ] not require the repetitive hand use that causes [her] pain," but noted that "[d]espite these exercises, [her] condition has only slowly improved."  (AR 1633.)

Plaintiff also acknowledged therein that, after she had stopped working, she had "traveled to places like New York, Cuba, Chile and Florida," but that when she traveled she "didn't have to worry about things like cooking and cleaning," she "used a neck pillow [on the plane], so [her] neck was supported," and she "never lifted any bags," rather, she "used porters and friends."  (AR 1633-34.)  Plaintiff further stated that when, on two occasions, she drove two hours to visit her sister, she "had to stop and take a break every 45 minutes" and she "mostly held the wheel lightly with [her] hands in her lap."  (AR 1634.)

The opinions provided by plaintiff's physicians and physical therapist, and plaintiff's declaration, as set forth above, if accepted, are sufficient to support a finding that plaintiff was unable to perform the important duties of her own occupation on a full-time or part-time basis from October 25, 2004 through January 23, 2005.  Defendants argue, however, that the opinion of plaintiff's treating physician Dr. Minkowski and the opinion of James Y. Soong, M.D. ("Dr. Soong"), a physician who examined plaintiff for purposes of her Workers' Compensation claim, as well as the opinions of examining physicians retained by Paul Revere, specifically, Gordon C. Lundy, M.D. ("Dr. Lundy") and Charles Skomer, M.D. ("Dr. Skomer"), are more credible than the opinion of Dr. Newkirk, and that said physicians' opinions do not support a finding that plaintiff was disabled.  Defendants also rely on the opinions of several physicians who reviewed plaintiff's medical records at Paul Revere's request, specifically, Joseph R. Thomas, M.D., ("Dr. Thomas"), Richard Tyler, M.D., ("Dr. Tyler"), and Alan Neuren, M.D. ("Dr. Neuren"), and contend the reviewing physicians'

1    opinions, along with vocational analyses and plaintiff's travel and exercise activities,

2    demonstrate plaintiff is able to work as an attorney.

3         Dr. Soong, a neurologist and "Qualified Medical Evaluator" for purposes of Workers'

4    Compensation, evaluated plaintiff on two occasions in connection with her Workers'

5    Compensation claim, each time at the Workers' Compensation insurer's request.  (AR 829-

6    33.)  Based on his initial examination, conducted on January 31, 2002, Dr. Soong

7    diagnosed plaintiff with "repetitive strain injury," and recommended plaintiff "finish her hand

8    therapy and acupuncture and be discharged to self-care."  (AR 831.)  Following his second

9    examination, on September 29, 2003, Dr. Soong again diagnosed plaintiff with "repetitive

10   strain injury of both upper extremities, of industrial causation."  (AR 832.)  Dr. Soong was of

11   the opinion that plaintiff's "medical treatment and disability after January 31, 2002 . . . were

12   not reasonable and necessary."  (Id.)  Dr. Soong found "no objective factors of disability,"

13   "no evidence of neurogenic thoracic outlet syndrome," and "no evidence of vascular

14   thoracic outlet syndrome."  (Id.)  Dr. Soong reported plaintiff had "no work restrictions" and

15   that "[n]o future medical care [was] indicated other than self-supervised exercises."  (Id.)

16   Additionally, Dr. Soong concluded Dr. Newkirk's "treatment and recommendations [were]

17   excessive, medically unreasonable and unnecessary for repetitive strain injuries."  (Id.)

18        At Paul Revere's request, plaintiff participated in an Independent Medical

19   Examination ("IME") conducted by Dr. Lundy, an orthopaedic surgeon, on July 23, 2003.

20   Dr. Lundy reported he had examined plaintiff and had also reviewed her medical records,

21   (AR 656), and that he had diagnosed plaintiff with "possible thoracic outlet syndrome, and

22   subclavian vein thrombosis," (AR 671).  Dr. Lundy submitted a supplemental report on

23   September 30, 2003, wherein he stated:

24        I believe [plaintiff] is unable to perform the frequent extended computer
          work that was stated to be an integral part of her work as an attorney.
25        Specifically, I do not believe she could do prolonged keyboard work (e.g.,
          greater than 15-20 minutes of uninterrupted keyboard input).  I believe she
26        would be unable to perform any tasks, requiring repeated lifting or
          reaching above shoulder level, such as reaching to access books or files.
27
     (AR 706.)
28

                                          13

1         Plaintiff participated, again at Paul Revere's request, in a second IME conducted by

2  a neurologist, Dr. Skomer, on October 14, 2004.  (AR 1057.)  At that time, Dr. Skomer

3  found "multiple discrepancies in the opinions provided in [plaintiff's] medical records," and

4  that her examination did not reveal "objective abnormalities" and provided "no evidence for

5  a significant myofascial, neurological, or thoracic outlet diagnosis."  (AR 1060.)  Dr. Skomer

6  observed plaintiff to have "full cervical range of motion without cervical paraspinous muscle

7  spasm, and full range of motion of her upper extremities with normal deep tendon reflexes

8  and no muscle atrophy."  (AR 1061.)  Dr. Skomer further observed that plaintiff "was able to

9  use her arms normally during the examination and without apparent discomfort."  (Id.)  Dr.

10  Skomer concluded plaintiff "could return to her normal occupation as an attorney without

11  limitations or restrictions."  (Id.)

12         In a report dated March 21, 2005, Dr. Skomer provided supplemental findings,

13  based on his review of additional materials from Drs. Newkirk and Avery, an MRI taken on

14  February 10, 2005, and an article and testimonial written by plaintiff.  (AR 1194.)  In

15  particular, Dr. Skomer noted plaintiff had provided a "testimonial . . . for the Institute For

16  Internal Transformation," in which plaintiff, as quoted by Dr. Skomer, stated "that studying

17  with Chris Fermie has resulted in a 'profound improvement in [her] physical and emotional

18  health'" and she "'rarely [has] physical pain or get[s] sick with cold and flues,'" which

19  statements were "at variance from the history [plaintiff] provided when examined by [Dr.

20  Skomer] on October 14, 2004."  (AR 1195-96.)[6]  Dr. Skomer stated that "reports . . . by Dr.

21  Newkirk and Dr. Avery are not supported by the examinations performed by myself, by Dr.

22  Gordon Lundy, Dr. Robert Minkowsky, or by Dr. James Soong."  (AR 1195.)

23         Additionally, Dr. Skomer questioned the technique used in obtaining the

24  February 10, 2005 MRI, (AR 1196), and recommended "a radiologist specialized in body

25

26

27

28        [6] Dr. Skomer does not indicate the dates of the article and testimonial.

1   imaging review the MRI scan and comment on the [accompanying] report," (id.).[7]  Dr.

2   Skomer noted that "no supraclavicular fossa edema was present on the thoracic outlet MRI

3   scan," which result "questions the clinical findings of Dr. Newkirk and Dr. Avery."  (AR

4   1196.)  Dr. Skomer concluded plaintiff "does not have findings consistent with thoracic

5   outlet syndrome or with other organic causes of severe pain."  (See id.)  Dr. Skomer also

6   reiterated the finding from his October 14, 2004 report that "symptoms from a repetitive

7   strain syndrome would have been expected to have resolved within several months of

8   onset," (see id.), and confirmed his earlier opinions contained in said report, (see id.).

9        Paul Revere also obtained opinions from physicians who did not themselves

10  examine plaintiff.  In a report dated April 11, 2003, Dr. Thomas, a reviewing physician

11  retained by Paul Revere, opined that plaintiff's medical records contain "few if any objective

12  findings that note functional impairment" and "do not support any consistent injury or

13  evidence of chronic irritation in one specific area."  (AR 495-96.)  Dr. Thomas found "[t]here

14  is no supportable diagnosis or R&Ls [Restrictions and Limitations]," and found no "support

15  for [plaintiff's] inability to perform as an attorney from the information submitted."  (AR 496.)

16  In a supplemental report dated April 16, 2003, Dr. Thomas stated that plaintiff's complaints

17  "appear to be subjective and without objective evidence to support them" (AR 502), and

18  that "her exercise program" including "Salsa dancing appears to entail more physical

19  activity than her occupation," (id.).  Upon a subsequent review of plaintiff's file, Dr. Thomas,

20  in a report dated June 2, 2004, was of the opinion that plaintiff's "[r]elease to work as of

21  June 2004 [was] long overdue" (AR 937), and that plaintiff's "ability to travel extensively and

22  perform her dancing and physical therapy conflict with her reported inability to function as

23  an attorney" (id.).

24  _____

25       [7] Following Dr. Skomer's recommendation that a radiologist review the February 10,
     2005 MRI, (AR 1196), Paul Revere contacted several radiologists who either declined to
26   render a report or stated they were unable to read the MRI, (AR 1268, 1293, 1304).  In a
     report dated June 9, 2005, radiologist Travis A. Van Meter, M.D. ("Dr. Van Meter") stated
27   the MRI showed "no evidence of mass in the thoracic outlet region on either side."  (AR
     1309.)  Dr. Van Meter found "the images are within normal limits," (id.), and the MRI shows
28   "normal anatomy with no evidence of central occlusion," (AR 1310).

1    Dr. Tyler, an orthopedic surgeon retained by Paul Revere to review plaintiff's file,

2  noted, in a report dated October 22, 2004, that neither Dr. Soong nor Dr. Skomer's

3  examinations indicated "any objective finding which correlated with [plaintiff's] complaints."

4  (AR 1064.)  Dr. Tyler found "the absence of atrophy and the normal strength, tone and bulk

5  in [plaintiff's] upper extremities" to be "[o]f greatest significance" with respect to an

6  individual reporting "symptoms of such intensity that she has not been able to work."  (Id.)

7  Dr. Tyler concluded there was "no objective evidence in [plaintiff's] file of any significant

8  impairment which would support any R/Ls [Restrictions/Limitations] or prevent [the]

9  claimant from returning to her normal occupation of attorney."  (Id.)

10    In a subsequent report dated June 16, 2005, however, Dr. Tyler stated that,

11  "[f]ollowing review of the additional information received" subsequent to his last review of

12  plaintiff's records on October 22, 2004, specifically, the intervening reports of Dr. Newkirk

13  and Dr. Avery, as well as the February 10, 2005 MRI and Dr. Van Meter's report thereon,

14  (AR 1328-29), in his opinion plaintiff "does have structural bilateral thoracic outlet

15  syndrome."  (AR 1329.)  In Dr. Tyler's opinion, the results of Dr. Avery's examination

16  "provided clinical affirmation of the presence of thoracic outlet syndrome," (id.).  Dr. Tyler

17  did observe, however, that "none of [plaintiff's] additional information referred to any

18  atrophy about the neck, shoulders or extremities" (id.); according to Dr. Tyler, in "a patient

19  with thoracic outlet syndrome with pain so severe as to require total disability, atrophy

20  would be so severe and outstanding that describing it would figure prominently in the

21  examination of the patient" (id.).

22    In the same report, Dr. Tyler specified that plaintiff's activities were subject to the

23  following restrictions and limitations:

24        "[N]o overhead use of the arms.  Lifting and carrying should be limited to 5
          pounds occasionally, 10 pounds frequently, never in excess of 15 pounds.
25        When using a computer, ergonomic support should be provided for the arms
          and claimant needs to be able to change position of the arms as necessary."
26

27  (Id.).  Dr. Tyler went on to explain that "thoracic outlet syndrome is a condition for which

28  surgical alleviation is readily available" and stated the above restrictions and limitations

1   "need to continue until such time as [plaintiff] decides to submit to definitive treatment for

2   this subjective condition."  (Id.)  Dr. Tyler concluded that although "[t]he MRI findings and

3   examination by Dr. Avery do confirm that the claimant has thoracic outlet syndrome," such

4   "information does not support total disability."  (Id.)  Dr. Tyler reiterated his findings upon

5   further review of plaintiff's file on June 22, 2005.  (AR 1339.)

6        The record also includes an April 20, 2006 report of a review of plaintiff's medical

7   records by Dr. Neuren, a neurologist retained by Paul Revere (AR 1764-78), in which report

8   Dr. Neuren noted that many of plaintiff's providers "have found little if any objective findings

9   along with indications of symptom embellishment," (AR 1775-78).  Dr. Neuren stated that

10  "[e]lectrodiagnostic studies should have been performed" to test for neurogenic thoracic

11  outlet syndrome.  (AR 1776).  Dr. Neuren then concluded that findings regarding plaintiff's

12  condition are "either inconsistent or not significant with regard to impairment."  (AR 1777.)

13  On April 27, 2006, Dr. Neuren provided an addendum to his report, wherein he identified

14  only one "reasonable and appropriate" restriction and limitation: "No reaching above

15  shoulder height or overhead work on more than an occasional basis."  (AR 1779.)

16       Defendants also rely on two reports by vocational rehabilitation expert Catherine C.

17  Rogers ("Rogers").  In the first such report, dated July 8, 2004, Rogers described the

18  physical demands of the occupation of attorney as: constant "Talking" and "Hearing,"

19  frequent "Reaching," "Handling," "Fingering," and "Near Acuity," and occasional

20  "Accommodation."  (AR 963.)  In Rogers' opinion, "typing is not a requirement for Attorney's

21  in the San Francisco area as secretaries or assistants are generally required for these

22  positions," and that "numerous attorney positions are available in the San Francisco area

23  and they do not require typing over 15-20 minutes at a time, or repeated lifting or reaching

24  above shoulder level."  (AR 964.)  Rogers further stated that "keyboarding and reaching

25  above shoulders" are "occasional requirements of the occupation."  (Id.)  Rogers thus

26  concluded that plaintiff "would be able to perform her own occupation with another

27  employer."  (Id.)

28       Rogers submitted a second vocational report to Paul Revere on July 5, 2005,

17

1   wherein Rogers considered whether plaintiff could "perform her occupation with the

2   restrictions and limitations supported by Dr. Tyler." (AR 1348.)  In Rogers' opinion, "[t]he

3   only question regarding [plaintiff's] ability to perform her own occupation is overhead use of

4   the arms." (AR 1349.)  Rogers reasoned plaintiff could "organize her desk so that reaching

5   is not performed overhead," and "therefore overhead use of the arms would not be a[n]

6   essential function of this occupation." (Id.)  With regard to the specific restriction involving

7   computer usage, Rogers relied on a December 12, 2003 "Labor Market Survey" for her

8   opinion that "computer use is not a requirement greater than 15-20 minutes at a time." (Id.)

9   Rogers also noted that "[t]he occupation is considered sedentary, without the need for

10  repetitive lifting." (Id.)  Rogers concluded plaintiff "would be able to perform her own

11  occupation within the restrictions and limitations noted by Dr. Richard Tyler, M.D." (Id.)

12          Additionally, the record contains evidence, on which defendants rely, of plaintiff's

13  travel and exercise activities after she stopped working in October 25, 2002.  In February

14  2004, for example, plaintiff took a vacation in Chile. (AR 808.)  When plaintiff was

15  questioned by a Paul Revere representative about her ability to travel to Chile, plaintiff

16  explained she had discussed the flight to Chile with her doctor, paid porters to handle her

17  luggage, and was taken care of by a friend while in Chile.  (AR 816-17.)  In addition to her

18  travel to Chile, during the period after plaintiff stopped working, she also "flew to Brazil and

19  hiked, New York City and walked, Cuba and took dance classes two to three times per

20  week" (AR 830); she also traveled to Florida, in October 2004, to participate in "election

21  protections" volunteer work (AR 1072).  Further, as noted, plaintiff, after her injury, also

22  continued to participate in Salsa dancing and engaged in Qigong exercises.  (AR 1632.)

23                  **b. Findings of Fact and Conclusions of Law**

24          The Court finds the opinions of Dr. Avery and Dr. Lundy to be persuasive with

25  respect to plaintiff's restrictions and limitations in performing the important duties of her own

26  occupation.  First, Dr. Avery is a cardiovascular and thoracic surgeon, (AR 599), a

27  specialist in the area of the body in which plaintiff claims her disabling condition arises.

28  Second, Dr. Avery conducted two physical evaluations of plaintiff, the first of which

1    evaluations was performed on May 15, 2003, (AR 600), during the time in which plaintiff

2    was receiving disability benefits, and the second of which evaluations was performed on

3    January 12, 2005, (AR 1147), shortly after Paul Revere had terminated plaintiff's benefits.

4    On both occasions, Dr. Avery discussed plaintiff's prior symptoms in detail, reported his

5    objective findings, and outlined how such findings supported his diagnosis of "bilateral

6    thoracic outlet syndrome" and his conclusion that plaintiff was unable to work as an

7    attorney.  Dr. Avery's conclusion that plaintiff was restricted to working at a computer for

8    only 20 minutes at a time, and for no more than twice a week, is supported by the objective

9    medical findings identified in his opinion.

10          Further, the conclusion reached by Dr. Avery as to plaintiff's inability to perform her

11   own occupation is confirmed by the opinion of Dr. Lundy, who conducted an independent

12   medical examination.  Dr. Lundy examined plaintiff, at Paul Revere's request, on July 23,

13   2003, a date between the two occasions on which Dr. Avery examined plaintiff.  Thereafter,

14   Dr. Lundy rendered a thorough report and opinion, in which he relied on his own objective

15   testing and findings, as well as a review of plaintiff's medical history, and, at that time,

16   diagnosed plaintiff with "possible thoracic outlet syndrome."  (AR 671.)  Six months

17   thereafter, on September 30, 2003, Dr. Lundy, in a supplemental report in which he again

18   set forth his opinion based on "objective" findings, concluded plaintiff's condition rendered

19   her "unable to perform the frequent extended computer work that was stated to be an

20   integral part of her work as an attorney," in that she could not do more that "15-20 minutes

21   of uninterrupted keyboard input."  (AR 706.)  Dr. Lundy was of the further opinion that

22   plaintiff could not perform tasks "requiring repeated lifting or reaching above shoulder level,

23   such as reaching to access books or files," (id.), and stated he did not believe that plaintiff

24   "was capable of performing the hours of legal research she indicated [were required by her

25   occupation]" (id.).

26          As to plaintiff's travel, dance, and exercise activities, the Court notes that plaintiff

27   discussed her plans with Dr. Newkirk, who approved plaintiff's participation in such

28   activities.  (See, e.g., AR 816, 1632.)  Additionally, plaintiff's dance and exercise activities

19

1  are of a different nature than the hand movements, overhead reaching, neck flexing, and

2  long-term stationary activity that cause plaintiff's symptoms.  Although lengthy air travel

3  involves one of the same activities to which plaintiff attributes her symptoms, specifically,

4  sitting for an extended period of time, plaintiff acknowledged such travel caused some

5  aggravation of her condition, (AR 1633), and, in any event, plaintiff's travel was intermittent,

6  as opposed to the extended continuous sitting on a daily basis as required by plaintiff's

7  occupation.  In sum, the Court finds plaintiff's dance and exercise activities and travel do

8  not demonstrate she was able to perform the important duties of her own occupation.

9       The Court finds the opinions of Dr. Soong and Dr. Skomer to be less persuasive

10  than the opinions of Dr. Avery and Dr. Lundy.  In particular, Dr. Soong's diagnosis of

11  "repetitive strain injuries of both upper extremities," is based primarily on a lack of objective

12  findings during his examination.  (AR 832.)  Dr. Soong acknowledges, however, and does

13  not contradict, Dr. Avery's finding of a "subclavian vein thrombosis," a finding consistent

14  with thoracic outlet syndrome of the vacsular type, nor does he explain how plaintiff, given

15  her "repetitive strain injuries of both upper extremities" (AR 832), could work without

16  restrictions in an occupation that requires, among other activities, "constant," i.e., for "6-8+

17  hours" per day, "repetitive use of hand[s]," "fine manipulation," and "reaching out from [the]

18  shoulder." (AR 104).

19       Dr. Skomer, like Dr. Soong, is a neurologist rather than a cardiovascular and

20  thoracic specialist.  Further, although he acknowledges plaintiff's report that her pain "is

21  exacerbated" by "use of her arms including washing her hair or using a computer," as well

22  as "neck flexion" (AR 1058), Dr. Skomer discredits such reports based, in large part, on

23  plaintiff's ability "to use her arms normally during the examination and without apparent

24  discomfort" (AR 1061), none of which involved the sustained or repetitive movements that

25  are reported to precipitate plaintiff's pain.  Although Dr. Skomer also bases his opinion of

26  repetitive strain injury on negative neurological findings, he does not discuss Dr. Avery's

27  finding of subclavian vein thrombosis or acknowledge the differences between thoracic

28  outlet syndrome caused by venous or arterial compression as opposed to neurologic

1    compression.  (See AR 1776 (distinguishing causes of thoracic outlet syndrome).)[8]

2           Although the Court places less reliance on the opinions of reviewing physicians than

3    it accords the opinions of examining physicians, the Court notes that one of those reviewing

4    physicians, Dr. Tyler, agreed with plaintiff's treating specialists and defendants'

5    independent examiner Dr. Lundy, to the extent Dr. Tyler was of the opinion that plaintiff

6    does have thoracic outlet syndrome.  The Court, however, unlike Dr. Tyler, is not

7    persuaded that a lack of muscular atrophy is dispositive with respect to the question of

8    plaintiff's ability to perform the work of an attorney.

9           The Court finds the opinion of Rogers, defendants' vocational rehabilitation expert,

10   unpersuasive, for the reason that Rogers' opinion is not based on all of plaintiff's functional

11   limitations as identified by Dr. Avery and Dr. Lundy.  See, e.g., Bruce v. New York Life

12   Insur. Co., 2003 U.S. Dist. LEXIS 7225 at *16-17 (N.D. Cal. 2003) (holding opinion of

13   vocational expert cannot support denial of benefits unless hypothetical used includes all of

14   claimant's functional limitations) (citing Thomas v. Barnhart, 278 F.3d 947, 956 (9th Cir.

15   2002)).[9]

16          In applying plaintiff's restrictions and limitations specified by Dr. Avery and Dr. Lundy

17   to the important duties of plaintiff's occupation, the Court finds plaintiff's "significant

18   limitations in terms of working at the computer" (AR 1150), which work plaintiff can perform

19   for a maximum of 20 minutes at a time, and not more often than twice a week (id.; AR 706),

20   preclude plaintiff from meeting the physical demands of her occupation, specifically,

21   constant "repetitive use" and "fine manipulation" of her hands, as well as constant "reaching

22

23        [8]  Although defendants also note Dr. Minkowski's diagnosis of repetitive strain injury,
      Dr. Minkowski, as noted, is an internist, who referred plaintiff to a specialist, Dr. Newkirk,
24    for a second opinion.  Additionally, Dr. Minkowski himself placed plaintiff on disability, (AR
      399), and thereafter, was of the opinion that plaintiff should not engage in "lifting, carrying,
25    pushing, pulling, repetitive hand movement, gripping, or grasping," (AR 22), and was
      unable to "use [ ] a computer with keyboard or mouse, writ[e for greater than] 10 minutes,
26    [perform] fine motor movements, [and maintain a] flexed head + neck position," (id.), such
      that she was unable work in her occupation, (id.).

27        [9] Additionally, Rogers' opinion that attorneys are not required to type for "over 15-20
      minutes at a time" appears to be inconsistent with the realities of modern legal practice, at
28    least as to the expectations of attorneys raised in the computer age.

1  out" from her shoulders. (Id.).[10]

2      In sum, the Court concludes plaintiff was unable to perform the important duties of

3  her own occupation from October 25, 2004 through January 23, 2005, and, accordingly,

4  qualifies for "Total Disability" benefits for said period.

5      **2.  "Residual Disability" Benefits**

6      The Court next considers whether plaintiff is "Residually Disabled" for the period

7  from January 24, 2005 through the present.  In order to demonstrate she is entitled to such

8  benefits, plaintiff must show that "as a result of Injury or Sickness, [plaintiff] is unable to

9  work [f]ull-time in any occupation for which [she] is or may become suited by education,

10  training or experience, but:

11      1.      [she] is able to perform one or more of the important duties of any
                occupation on a part-time basis; and

12      2.      [she] is earning less than 80% of [her] Prior Earnings."

13  (AR 163.)  The parties do not dispute that plaintiff is able to perform one or more of the

14  important duties of some occupations on a part-time basis, or that she is earning less than

15  80% of her prior earnings.  The parties diverge as to the question of plaintiff's ability to work

16  full-time in any occupation for which she is or may become suited by education, training, or

17  experience.

18      At the outset, the Court notes that Paul Revere upheld the decision to terminate

19  plaintiff's benefits on the ground plaintiff could perform her own occupation as an attorney.

20  Although, as plaintiff points out, the record contains evidence pertaining to plaintiff's interest

21  in performing other occupations (see, e.g., AR 795 (noting, in vocational rehabilitation

22  report, plaintiff's interest in becoming "executive life coach")), as well as income from other

23

24      [10] To the extent defendants contend plaintiff could perform her own occupation with
    accommodations provided by her employer, such as an "ergonomic desk" and "voice

25  activated software" (see Defs.' Opp'n to Pl.'s Mot. for Summary J. at 4:17-21), defendants'
    argument is not supported by legal authority.  Because the Plan's definition of "Totally

26  Disabled" does not include accommodations made by the employer, (AR 163), the Court
    does not consider such accommodations in evaluating whether plaintiff satisfies the

27  definition.  See, e.g., Saffle v. Sierra Pacific Power Company Bargaining Unit Long Term
    Disability Plan, 85 F.3d 455, 459 (9th Cir. 1996) (holding interpretation of "total disability"

28  definition to include employer accommodations contrary to plan's plain language).

1    occupations (see, e.g., AR 1726 (plaintiff's 2005 tax return reporting business income)), the

2    record lacks medical reports or any opinion from a physician addressing plaintiff's ability to

3    perform the important duties of occupations other than her own.[11]  Consequently, the Court

4    finds Paul Revere, in determining plaintiff could perform the duties of her "own occupation,"

5    did not consider plaintiff's ability to perform the duties of "any occupation."

6         Moreover, the record contains no evidence from a vocational expert as to whether,

7    with the above-specified restrictions and limitations, plaintiff could perform any other

8    occupation(s).  In the absence of such evidence, the Court is unable to determine whether

9    occupations exist in which plaintiff is able to engage full-time, nor is the Court able to

10   assess the degree to which plaintiff's medical restrictions may impact such potential

11   employment.

12        Accordingly, to the extent plaintiff claims "Residual Disability benefits" for the period

13   from January 24, 2005 through the present, the Court finds there is inadequate medical and

14   vocational evidence in the record to support a finding on such issue, and will remand the

15   claim to the administrator for consideration.  See Saffle, 85 F.3d at 460 (holding district

16   court lacked authority court to award "second tier" benefits, based on claimant's inability to

17   engage in any business or occupation, where "there [was] nothing in the administrative

18   record about general disability").

19   **C.    Prejudgment Interest**

20        In her motion, Plaintiff requests prejudgment interest at a rate in excess of the short-

21   term Treasury bill rate.  See 18 U.S.C. § 1961.  The Court finds prejudgment interest is an

22   appropriate element of plaintiff's compensation herein, but finds plaintiff has failed to

23

24        [11] Plaintiff's reliance on Pease v. Hartford Life and Accident Ins. Co., 449 F.3d 435
     (9th Cir. 2006), for the proposition that this Court may award benefits based on plaintiff's
25   inability to perform "any occupation" is unavailing, for the reason that, in Pease, the Ninth
     Circuit found the defendant therein had waived any objection to an award of benefits
26   beyond the "own occupation" period by not raising such objection in the district court.  See
     id. at 446-47. Further, contrary to plaintiff's assertion, the issue here is not one of
27   administrative exhaustion of plaintiff's claim for "any occupation" benefits; rather, it is the
     lack of evidence in the record concerning plaintiff's ability to perform other potential
28   occupations in light of her restrictions and limitations.

demonstrate that an award at a rate higher than that provided in 28 U.S.C. § 1961 is justified in the instant case.  See Blankenship v. Liberty Life Assurance Co. of Boston, 486 F.3d 620, 628-29 (9th Cir. 2006) (noting interest rate under § 1961 generally appropriate, absent "substantial evidence" that "the equities of [the] particular case require a different rate"; upholding higher rate where plaintiff showed he would have invested monies, otherwise available had disability payments been made, in named fund earning specified rate of return); Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1164 (9th Cir. 2001) (holding no abuse of discretion where court awarded statutory rate despite plaintiff's evidence that defendant, during period in question, "earned substantially more than 4.91% on its investments").

**CONCLUSION**

Accordingly, for the reasons set forth above:

1.  Defendants' motion for summary judgment is hereby DENIED.

2.  Plaintiff's motion for judgment is hereby GRANTED in part and DENIED in part as follows:

a.  To the extent plaintiff claims benefits for the period from October 25, 2004 through January 23, 2005, the motion is GRANTED and plaintiff shall be entitled to benefits under the Plan for such period, together with prejudgment interest at the statutory rate.

//
//
//
//
//
//
//

1              b.  To the extent plaintiff claims benefits for the period from January 24, 2005

2  to the present, the motion is DENIES and plaintiff's claim for such benefits is remanded to

3  the claims administrator for determination of plaintiff's eligibility for such benefits under the

4  Plan's "any occupation" provisions.[12]

5        **IT IS SO ORDERED.**

6

7  Dated: December 23, 2008           MAXINE M. CHESNEY
                                  United States District Judge

---

[12] To the extent plaintiff is pursuing, on her second claim, an order "removing [ ] Paul Revere as Plan Fiduciary and barring it from any further responsibility for claims determinations under the Plan" (<u>See</u> Complaint at 4), the Court finds, given the conflicting opinions discussed above, plaintiff has failed to demonstrate Paul Revere acted other than based on its considered assessment of the medical evidence and, accordingly, plaintiff is not entitled to such additional relief.